# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# NORTHERN DIVISION

VIKTOR SHAHOLLI,

       Petitioner,

v.

JODI DEANGELO-KIPP,

       Respondent.

_____/

Case No. 17-13184

Honorable Thomas L. Ludington
United States District Judge

## OPINION AND ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS, DENYING CERTIFICATE OF APPEALABILITY, AND DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL

Petitioner, Viktor Shaholli, incarcerated at the Handlon Correctional Facility in Ionia, Michigan, has filed an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, through counsel, Martin J. Beres. Petitioner was convicted following a jury trial in the Macomb County Circuit Court of first-degree premeditated murder, Mich. Comp Laws § 750.316(1)(a), and possession of a firearm in the commission of a felony, Mich. Comp Laws § 750.227b. Petitioner was sentenced to life in prison without parole on the murder conviction and two years in prison on the firearms conviction. Petitioner contends that the trial judge erred in finding him competent to stand trial, that his re-trial following a mistrial violated the Double Jeopardy Clause, that the prosecutor committed misconduct, that the judge violated the Americans With Disabilities Act by failing to appoint a guardian ad litem to help Petitioner communicate with his attorney, and that he was denied the right to present a defense. Respondent filed an answer to the petition, asserting that the claims lack merit. Petitioner's claims do lack merit and the petition will be denied.

**I.**

The relevant facts relied upon by the Michigan Court of Appeals, "which are presumed correct on habeas review" pursuant to 28 U.S.C. § 2254(e)(1), are as follows. *See Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009):

> The facts of this case are not in dispute. On November 20, 2012, defendant shot and killed his daughter-in-law's brother, Dashamir Matjani (Dashamir). At trial, defense counsel argued that there was no motive for defendant to kill Dashamir, whom he had helped immigrate to the United States from Albania. Defense counsel argued that the apparent lack of motive was proof of defendant's mental illness. In contrast, the prosecution argued that defendant's motive in killing Dashamir was to punish his daughter-in-law, Emira Shaholli (Emira).

> Defendant had two sons, Arjan Shaholli (Arjan) and Bledar Shaholli (Bledar). Arjan was married to Emira. Defendant, Arjan's family, and Bledar's family all lived together in a large house on Hoffman Street in St. Clair Shores. Defendant had a masonry company where Arjan and Bledar worked, along with other extended family members, including Dashamir. As the head of the family, defendant controlled each family member's money. When the economy went into crisis and the housing market crashed, the home on Hoffman went into foreclosure. Defendant helped Arjan buy a house on Recreation Street and helped Bledar buy a house on Masonic.

> On the day of the murder, the family was days away from eviction from the Hoffman home. Many members of the family were at the Recreation address, working on the home so that Arjan, Emira and their two young sons could move in. Emira testified that defendant had been watching the boys and had left them at a family member's house. Emira retrieved the boys and brought them to the Recreation address. Defendant wanted to know why Emira had picked up the children and expressed his opinion that the children should not be there. Emira relented and returned to the Hoffman home with the boys. Defendant also went to the Hoffman home where he grabbed a shotgun. He returned to the Recreation house where he shot Dashamir. No one saw defendant shoot Dashamir and the gun found outside the home did not contain useable fingerprints. Nevertheless, defense counsel did not deny that defendant shot and killed Dashamir.

> After finding out that Dashamir had been shot, but before finding out that he was dead, Emira called defendant. She asked him what he had done. Defendant admitted that he had shot Dashamir. Emira testified: "he said he did it so my family would never talk to me for the rest of my life and hate me for the rest of my life." She called police and told them that she knew who had shot her brother. Defendant was prepared to turn himself into police. He called his cousin, Basri Sulolli, and admitted to shooting "Ellie's brother" because "he swore on us."

Defendant's mental health—or lack thereof—was the focus at trial. There was no dispute that defendant had suffered from migraine headaches for many years. Defendant's sons noticed a change in defendant after their mother died in November 2010. Defendant lost enjoyment in working. While everyone agreed that defendant seemed depressed, they did not necessarily agree on the extent of defendant's depression. Bledar testified that defendant would sit in a chair and simply stare at the fireplace. Defendant also made comments to family members about how his wife would come and visit him in the night. Bledar noticed that defendant would "talk nonsense." Defendant's hygiene also went downhill. Arjan testified that defendant was depressed but that he was able to carry on daily activities like eating, dressing and driving. Emira acknowledged that defendant was sad, but he did not appear depressed to her because he was engaged in his usual activities. Defendant had been taking care of the children for the weeks before the murder and Emira had no concerns about defendant's mental health; she described him as a good grandfather to his grandchildren.

Dr. Gerald Shiener diagnosed defendant with severe depression, as well as vascular dementia, which impacted mood, judgment, impulse control, and the ability to appreciate the consequences of actions. Shiener opined that "the combination of dementia and depression impaired Mr. Shaholli's ability to appreciate the consequences of his actions, plan out complex activities, and control impulses that he had." Additionally, Shiener concluded that defendant's "impairments were not consistent with the ability to appreciate right from wrong ... his impairments were not consistent with the ability to refrain from acting in the way that he did." Shiener did not believe that defendant was feigning his mental illness. Shiener believed the crime was without motive and "motiveless actions are more consistent with legal insanity and mental illness than obvious motives."

In contrast, Dr. Donna Rinnas, the director of evaluation services at the Center for Forensic Psychiatry, saw no evidence that defendant suffered from depression or dementia. Defendant's test scores were so low that it appeared defendant gave the wrong answers on purpose. It was Rinna's opinion that defendant "did not meet the criteria to be considered legally insane." She was critical of Shiener's failure to consider the police reports when determining whether defendant was legally insane at the time of the shooting. Rinnas considered the police reports and noted that defendant's behavior that day, including driving, retrieving a firearm, returning to the Recreation home, and going to the police station where he admitted that he shot someone displayed purposeful and goal-driven activities as opposed to some random and confused act.

Like Rinnas, Dr. Eric Neal opined that defendant was malingering. Neal was a psychiatrist and the unit leader of a long-term unit at the Center for Forensic Psychiatry. Neal had the opportunity to observe defendant for three months while defendant was at the Center for Forensic Psychiatry. Neal also periodically met with defendant individually. Neal, who was Shiener's former student, disagreed with Shiener's findings. Neal noted that defendant's CT scan did not show any

abnormalities of the brain and the MRI was inconclusive. Vascular dementia was particularized and required certain findings to diagnose. Neal did not believe defendant had vascular dementia, primarily because there was an absence of stroke.

*People v. Shaholli*, No. 325399, 2016 WL 3429826, at *1–2 (Mich. Ct. App. June 21, 2016).

Petitioner's conviction was affirmed. *Id., lv. den.* 500 Mich. 980, 893 N.W.2d 343 (2017).

Petitioner seeks a writ of habeas corpus on the following grounds:

I.     The trial court abused its discretion in finding Mr. Shaholli competent to stand trial while he was mentally ill to the extent that he did not understand the nature and object of the charges against him, and was unable to communicate with or assist counsel in the preparation of his defense.

II.    The trial court's finding that the prosecutorial misconduct resulting in a mistrial was unintentional was clearly erroneous and the subsequent retrial resulted in a violation of Mr. Shaholli's federal right against double jeopardy as guaranteed by U.S. Const. Am V.

III.   Mr. Shaholli's convictions of first-degree premeditated murder and felony firearm were the product of prosecutorial misconduct where the prosecution's opening statement and actions at his second trial denigrated the defendant and defense, conflated and misstated legal concepts that confused and misled the jury, and intentionally made improper, highly inflammatory and prejudicial remarks to the jury while interjecting extraneous factors into the trial. The trial court should have granted a mistrial.

IV.    The trial court erred in refusing to grant Mr. Shaholli's motion for accommodation under the American with Disabilities Act (ADA).

V.     The trial court abused its discretion in refusing to appoint a LGAL to assist Mr. Shaholli in the criminal proceedings, forcing conflicted trial counsel to act as advocate and guardian of his client, two mutually exclusive roles that adversely affected counsel's ability to properly represent Mr. Shaholli's interests and provide constitutionally effective counsel, and was contrary to Michigan Rules of Professional Conduct 1.14 and ABA standards.

VI.    The trial court erred where it refused to admit evidence of the orders of the Macomb County Probate Court finding that Mr. Shaholli was mentally ill and could not independently conduct normal daily activities or financial matters, which were relevant and admissible and implicated his right to present a defense.

## II.

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410–11. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). To obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. A habeas petitioner

should be denied relief as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable. *See Woods v. Etherton,* 136 S. Ct. 1149, 1152 (2016).

## III.

### A.

Petitioner first alleges that the trial court judge erred in finding him competent to stand trial, where he presented evidence that he suffered from a mental illness that prevented him from being able to understand the proceedings or assist his defense counsel. In his related fourth claim, Petitioner argues that his mental incompetence required the trial court to provide him with accommodations under the Americans with Disabilities Act ("ADA"), 42 USC 1201 *et seq*. In his fifth claim, Petitioner argues that the trial court erred in failing to appoint Petitioner a guardian ad litem (L–GAL) to assist him in communicating with his defense attorney. As the claims are related, they will be analyzed together.

A defendant may not be put to trial unless he has a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding [ ] and a rational as well as [a] factual understanding of the proceedings against him." *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996); *Dusky v. United States*, 362 U.S. 402, 402 (1960).

Evidence of a defendant's irrational behavior, his demeanor at trial or at another court proceeding, and any prior medical opinions on competence to stand trial are all relevant in determining whether further inquiry by a trial court on a defendant's mental state is required. *Drope v. Missouri*, 420 U.S. 162, 180 (1975). However, even one of these factors standing alone, may in some circumstances, be sufficient to trigger a further inquiry into a defendant's mental fitness to stand trial. *Id*. However, there are "no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed." *Id.*

The Michigan Court of Appeals rejected Petitioner's claim in a very lengthy analysis:

At the competency hearing, Ancuta Matei testified that she was a medical doctor and board certified in adult and geriatric psychiatry. She was an assistant professor at Wayne State University and also conducted daily psychiatric evaluations. Matei evaluated defendant on March 28, 2014, interviewing him through an interpreter. Matei was "struck by [defendant's] inability to really give coherent logical information whether through interpreter or not. I was able to make some eye contact at times, but he was not able to give me ... logical, coherent information about any of the events leading to him being in this particular situation and being evaluated by me." Defendant did not give inappropriate answers, but they were short and "nonelaborate." He had a "very sad affect, very perplexed affect when it came to confronting him with the allegations. And vacant ... not really present, very indifferent at times." Defendant was unable to perform simple cognitive screening tests.

Family members had informed Matei that defendant had lost his wife to pancreatic cancer approximately three years before the evaluation. It was at that time that he began to display unusual behavior. Defendant stopped taking care of himself and began relying on family members for daily living. He lost interest in activities and his behavior became erratic. Matei believed that defendant had depression in the context of bereavement. He complained more of migraine headaches and chronic pain could aggravate depression. Matei testified that, if severe enough, a major depressive order combined with a pain disorder and cognitive disorder could affect competency. The fact that the crime was committed near the anniversary of his wife's death was significant in the context of major depressive disorder.

As part of the medical analysis, Matei reviewed an MRI report prepared by Dr. Aronov from February 5, 2013.[1] There was a very small hemorrhagic lesion, or bleeding on the brain, in the right posterior temporal lobe. Matei believed such a finding was consistent with vascular dementia and was a physical symptom of impairment. Absent other symptoms and her personal observation of defendant, it would not necessarily be significant. But Matei's clinical findings from her interview, combined with the MRI suggested that defendant was impaired. Because of his cognitive impairments, Matei concluded that defendant "was not really able to organize his thoughts in a logical way. He was not really able to plan ... So that tells me that he is not able to make informed decisions at any point, even for simple decisions." Defendant also had "a highly suggestive vascular lesion of a cavernous angioma," which can cause memory problems and seizures, as well as "periventricular and deep cerebral white matter bilaterally," which were significant of ischemia (problems with blood flow); there was a "very high probability" that defendant had suffered mini strokes based on the migraine headaches.

---

[1] She did not actually review the MRI itself. (Footnote original).

Matei diagnosed defendant with significant impairment in functioning. He had a cognitive disorder consistent with symptoms of vascular dementia and had severe major depressive disorder. Matei explained that a cognitive impairment impacted memory, rational thought, organizing, planning and sequencing. Matei explained that vascular dementia included a disturbance in memory and executive function. An individual with the disease would have difficulty remembering things and performing daily activities. Matei did not believe that defendant was "malingering," meaning intentionally producing his symptoms "with a secondary gain." Ultimately, Matei opined that defendant was unable to understand the nature and the object of the proceedings and was incapable of assisting defense counsel.

Clinical neuropsychologist Firoza Van Horn visited defendant at the Macomb County Jail on October 11, 2013 and April 8, 2014 for a total of three hours. Defendant was "distant," "detached," "in his own world," and could not give Van Horn his background history or a version of what happened on the day of the murder. Van Horn did not even bother to administer tests. Defendant was delusional; he talked about his wife and how she visited him in jail. Van Horn did not believe that defendant was malingering. Like Matei, Van Horn believed that the abnormalities shown on the MRI confirmed her impressions that defendant may suffer from vascular dementia. Defendant had severe depression with a brain impairment. Van Horn did not believe that defendant had an understanding of the nature and object of the proceedings against him and was incapable of assisting counsel in his defense.

Dr. Gerald Shiener also testified for defendant. Shiener was Chief of Psychiatry at Sinai Grace Hospital and taught at Wayne State's Medical School and some law schools. Shiener interviewed defendant three times with the help of translators—in March 2012, April 2013, and March 2014. Shiener diagnosed defendant with "acute psychiatric illnesses, cognitive disorder vascular-type dementia," as well as major depression. Shiener found no evidence of malingering in defendant. Given defendant's statements that he saw his dead wife at night, Shiener believed defendant was "out of touch with reality." Shiener reviewed Aronov's report and also looked at the MRI himself. He believed that defendant's brain was small for a man his age, which was significant because it coincided with problems in memory, concentration, attention and behavior. Defendant also had some "vascular issue." There were objective indications on defendant's x-ray that coincided with Shiener's clinical observations. Shiener believed defendant was unable to understand the nature or object of the proceedings against him and was unable to assist in his defense.

Ronald Jamieson testified that he was a deputy at the Macomb County Jail and had the opportunity to observe defendant since August 2013. Jamieson considered defendant to be a "role model" inmate. Jamieson saw defendant communicate with other inmates. Defendant did not appear confused or unable to handle daily activities. Jamieson also observed defendant playing chess and checkers.

Adriatik Jeminaj testified that he was a corrections deputy at the Macomb County Jail and also spoke Albanian. Defendant was a model inmate with the exception of a statement defendant made on July 21, 2012 regarding wanting to twist the head of a mental health professional who had him transferred to jail.

Thomas Brewer testified that he was a forensic examiner at the Center for Forensic Psychiatry. He had a master's degree in social work and a Ph.D. in clinical psychology. Brewer met with defendant on October 7, 2013. Defendant appeared unkempt and disheveled. At times defendant's comments were on point and at other times he was entirely off the mark. Normally, Brewer would not expect to see such a variation (6/20/14 Competency Hearing, p 58.) Brewer testified: "And then at one point when I, after I'd gotten to the point where I realized that he was not going to cooperate, and I told him that I was going to have to tell Your Honor what my opinion was about his cooperation. He just, he terminated the interview and said [']screw this['] and he stopped the interview." Brewer was unable to perform any tests but concluded that defendant did not appear to be suffering from dementia. Based on his own observations as well as reviewing other reports, Brewer believed defendant was "feigning" or "grossly exaggerating" his symptoms.

Dr. Eric Neal testified that he was board certified in general and forensic psychiatry. He was a staff psychiatrist at the Center for Forensic Psychiatry. Defendant was under Neal's supervision from March 14, 2013 to June 25, 2013 "[a]nd so in three and a half months that I had him it was very important to observe his capacities and did his capacities match up with his presentation." While defendant's scores on some tests were so low that it indicated he needed a lockdown nursing unit, Neal noted that defendant "provided observational evidence that suggested he was oriented to his circumstances, he had planning capacity, he had sequential memory, he also had the ability to start and stop complex events and that he also could self advocate on a regular basis for himself." As an example, Neal pointed to the fact that defendant came out of his room, obtained a remote control for the television, watched a soccer match, and then returned the remote control. Defendant, whom Neal had no doubt suffered from migraine headaches, advocated on his own behalf regarding the amount of medicine he was due. Defendant also loved playing chess and although his family indicated that he had stopped playing, defendant would advise his fellow inmates on their moves.

The CT scan was important to Neal because it was administered with and without contrast and there were no abnormalities; the MRI did not include a contrast. For vascular dementia, there would need to be physical findings, cognitive findings, and known evidence of stroke. There were no physical findings of vascular dementia by the emergency room physician, internal medicine physician, or neurologist. While Neal did not dispute the findings of the MRI, he took issue with how those findings were applied relative to defendant's presentation. The MRI was also consistent with normal age-related changes and congenital anomalies. Neal opined that defendant was malingering. After observing defendant for three months, Neal questioned whether defendant even had depression.

Defendant called as rebuttal witnesses two of his fellow prisoners. Anthony Webster testified that he was in a cell adjacent to defendant for eight months. Each inmate in maximum security at the jail had two hours a day out of the cell. At no time did Webster see defendant play checkers, chess, or cards. Defendant would walk back and forth as a form of exercise, but kept mostly to himself. The only word Webster heard defendant say was "easy" when someone was yelling in another cell. Defendant would ask Webster for soccer scores.

Stanley Duncan testified that he was in a cell adjacent to defendant. Defendant would say "hi" but did not appear to understand much English. Duncan never heard or observed defendant playing cards, dice, checkers or chess. They had coffee together every morning. Duncan, who did not know that defendant's wife was dead, would tease defendant that he needed to call his wife or she was going to "cut you off." Defendant would ask Duncan about his family. Sometimes defendant had trouble understanding English so Duncan would have to rephrase things or use hand gestures. Defendant loved soccer. There were occasions when defendant did not know what day it was or what was going on. Duncan once allowed defendant to use a razor blade to shave a portion of his face.

At the close of testimony and arguments, the trial court concluded that defendant was competent to stand trial. This finding was not an abuse of discretion. Contrary to defendant's contention, the trial court did not conclude that Shiener was "incapable" of reading the MRI and CT images. Instead, the trial court acknowledged that there were various interpretations of the images, but that the radiologist's opinion was the most important: "And I think the most poignant explanation is, and I think the most poignant statement was made by Dr. Neal that it is the radiologist who needs to properly evaluate the findings made in the tests such as the MRIs and that they are better suited because they are better studied." Additionally, the trial court was careful to state that it did not want to "diminish the testimony of the other doctors who had the opportunity to review the records, but I think significantly and substantially we need to look at which of the doctors had the opportunity to visit with the Defendant and observe the Defendant at more of a length of time than those that did not, such as Dr. Shiener, Dr. Matei ... I think Dr. O'Neal's [sic] opinion is based on sound conclusions. I, as I indicated I'm not in a position to diminish the other doctors. I'm suggesting that the other doctors have formulated an opinion without the advantages of Dr. Neal." Thus, there is no support for defendant's claim that the trial court ignored his experts' opinions.

Defendant also argues that the trial court placed too much emphasis on the Center for Forensic Psychiatry's staff observations of defendant while ignoring testimony from defendant's fellow inmates. In fact, the trial court found that the inmates' testimony was further evidence that defendant was competent: "harmful indeed were the testimony of the inmates who on a daily basis are able to communicate with this Defendant." Defendant chatted about sports with those inmates and shared daily coffee with one. The trial court's finding was rooted in the evidence.

> Finally, to the extent defendant argues that the trial court discounted trial counsel's claim that his client could not properly communicate, we take notice that defense counsel, Tim Barkovic, had an extensive history of bombastic behavior in Macomb County and has since resigned from the practice of law as part of an agreement with the Attorney Discipline Board. The veracity of the counsel's statements was for the trial court to determine.

> It is clear that the trial court's findings were "based in fact," and within the range of "reasonable and principled outcomes." Defendant asks this Court to substitute its judgment for the trial court, which it will not do.

*People v. Shaholli*, 2016 WL 3429826, at *3–7.

"A state-court determination of competence is a factual finding, to which deference must be paid." *Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012) (citing *Thompson v. Keohane*, 516 U.S. 99, 108–11 (1995)). Moreover, regardless of whether a federal habeas court would reach a different conclusion regarding a habeas petitioner's competence to stand trial were it reviewing the case *de novo*, the "findings of the state court must be upheld unless there is clear and convincing evidence to the contrary." *Id.* This "deference must be paid even to state-court factual findings made on appeal." *Id.*

In the present case, the trial judge found Petitioner competent to stand trial after conducting a lengthy competency hearing and listening to testimony from expert and lay witnesses presented both by the prosecutor and the defense. The judge chose to credit the testimony of the prosecutor's experts as well as those inmates whose testimony suggested that Petitioner was mentally competent. The Michigan Court of Appeals upheld those factual findings.

AEDPA's requirement that a federal court on habeas review should defer to a state court's factual determination concerning a defendant's competency to stand trial "undermines" Petitioner's claim. *Cowans v. Bagley*, 639 F.3d 241, 247 (6th Cir. 2011). "'There are, of course, no fixed or immutable signs' of incompetence, the standard is a high one, and the relevant factors—

'evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence'— 'are difficult to evaluate.'" *Id.* (quoting *Drope v. Missouri,* 420 U.S. 162, 180 (1975)). Thus, "[t]hese open-ended standards and the high threshold for establishing incompetence give state courts wide latitude in a habeas case." *Id.* Moreover, mental illness is not the same as mental incompetence. *Id.* at 247–48; *see also United States v. Miller*, 531 F.3d 340, 350 (6th Cir. 2008) ("the bar for incompetency is high").

The trial court record supports the Michigan Court of Appeals' findings, which upheld the trial court's competency determination. Petitioner failed to rebut that presumed-correct finding by clear and convincing evidence. To the extent that Petitioner challenges the trial judge's credibility determination, this Court notes that the trial judge who presided over a criminal defendant's competency hearing and trial "will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." *Indiana v. Edwards*, 554 U.S. 164, 177 (2008). Although there was conflicting expert testimony about Petitioner's competence to stand trial, there was substantial evidence upon which the state court trial judge could base her finding that Petitioner was competent to stand trial. Accordingly, Petitioner is not entitled to relief on his claim. *See Stanley v. Lazaroff*, 82 F. App'x 407, 416 (6th Cir. 2003). Petitioner's arguments, at most, speak to the probative value of the prosecution expert witnesses' opinion, and "amount to a contention that the trial court weighed [these experts'] opinion[s] too heavily. It is well-settled, however, that a reviewing court does not second-guess the fact finder's weighing of the evidence." *Id.* at 417. Thus, Petitioner's "arguments do not satisfy AEDPA's standard by identifying clear and convincing evidence that the state court unreasonably determined that he was competent to stand trial." *Id.* at 417-18. Petitioner is not entitled to relief on his first claim.

Petitioner in his related fourth and fifth claims alleges his mental disability required that the trial judge provide him with accommodations under the Americans with Disabilities Act (ADA) and that the judge erred in failing to appoint Petitioner a guardian ad litem (L–GAL) to assist him in communicating with his defense attorney.

The Michigan Court of Appeals rejected Petitioner's claims as follows:

Defendant's argument that the trial court should have appointed an L–GAL fails because (1) defense counsel failed to show that defendant was, in fact, disabled; and, (2) even if defendant was disabled, the law did not compel that an L–GAL be appointed, especially where defendant had competent legal counsel and had been appointed a guardian in the probate court.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

As the trial court repeatedly found, defendant was competent to stand trial and was malingering. While defendant claims that the inquiry of whether defendant was competent to stand trial is different from an inquiry as to whether defendant had a mental disability, the fact remains that defendant used the same symptoms to cover competence, mental illness and insanity. Not having a disability, defendant was not entitled to accommodations under the ADA.

Additionally, as defendant concedes, there is no case law to support his position that a defendant, who already has competent counsel and a guardian from a prior probate matter, must also have an L–GAL.

*People v. Shaholli*, 2016 WL 3429826, at \*13-14.

Petitioner's claim concerning the alleged violation of his rights under the Americans with Disabilities Act (ADA) is "inappropriate for a habeas corpus case." *Lowe v. Bear*, 2019 WL 1756283, at \*3 (E.D. Okla. Apr. 19, 2019). Petitioner's claim that the trial court violated his rights under the ADA is non-cognizable on habeas review. *Id.; see also Meyers v. Hedgpeth,* 2014 WL 1995466, at \*4 (N.D. Cal. May 15, 2014) ("The ADA is not a federal constitutional provision or guarantee."); *Watkins v. Idaho Bd. of Pardons & Parole,* 2008 WL 544843, at \*1 (D. Idaho Feb. 26, 2008).

The Michigan Court of Appeals reasonably concluded that Petitioner was not entitled to any special accommodations under the ADA because he failed to establish that he was mentally incompetent at trial. The trial judge did not err in refusing to appoint Petitioner a guardian ad litem, in light of the fact that he was found mentally competent to stand trial. *See e.g. Himchak v. Dye*, 684 F. App'x 249, 252 (3d Cir. 2017) (district court did not abuse its discretion in declining to appoint guardian to protect arrestee's interests under guardian ad litem rule, in action against state officials, prosecuting and defense attorneys, judges, and police sergeant challenging two state court criminal actions against him, a protection from abuse order obtained by his wife, and an action to quiet title related to the tax sale of his property; although arrestee had been found incompetent to stand trial by state court, state court subsequently found competency restored and resumed criminal proceedings).

Moreover, the United States Supreme Court has yet to determine whether a defendant with a mental disability is entitled to have a guardian ad litem assist him at trial when that defendant is represented by counsel. Given the lack of case authority by the Supreme Court addressing the question of whether a criminal defendant with a mental disability is entitled to a guardian ad litem to facilitate communication between the defendant and his counsel, the Michigan Court of Appeals' rejection of Petitioner's claim was not an unreasonable application of clearly established federal law. *See Wright v. Van Patten,* 552 U.S. 120, 126 (2008). Petitioner is not entitled to relief on his fifth claim.

**B.**

Petitioner in his second claim argues that his Fifth Amendment right against being placed in double jeopardy was violated when the judge permitted the prosecutor to re-try Petitioner after the judge declared a mistrial at Petitioner's first trial. Petitioner contends that the judge should

have dismissed the case with prejudice because the prosecutor intentionally provoked defense counsel into requesting a mistrial during the prosecutor's opening statement

The Michigan Court of Appeals rejected Petitioner's claim. The following excerpts are from the prosecutor's opening statement:

> Now, you heard in the beginning and some in voir dire that there was reference to different proofs and evidence and motive and things like that. First and foremost, motive is not an element. The People do not need to prove motive. In fact, many times there is no motive for murder. Self-defense isn't a motive for murder. Self-defense is justification. There is no murder for murder. But, in this case, ultimately it boils [down] to pride and power. It boils down to control. It boils down to Viktor Shaholli, of Albanian nationality, and his family. And it boils down, ultimately, to the death of an innocent bystander, Dashamir Matjani.

> * * *

> The defendant and his family at one point had a plan. They lived in St. Clair Shores and they lived in a beautiful, huge home. And it was being built for this one purpose, so that multiple families could create—I don't want to say a compound—but a community together. And the patriarch of that family was Viktor.

> * * *

> The compound, the communal environment was falling apart. Pride and power had its place ...

> * * *

> Now, the big question you will hear is why? Why did he do it? Frankly, the answer to that doesn't matter. I did it is what matters. And she'll tell you the motive. She asked him why. He said so the rest of the family will hate you. And you heard the term 'crazy' being thrown around. That seemed like a crazy rationale. But that's layperson crazy. That's not you and I. There is no rational, reasonable basis for doing something like that. But that is not legal insanity. Jihad is crazy to me. But that's not legal insanity.

Defense counsel moved for a mistrial, arguing that the prosecutor had inserted ethnic generalizations into the trial. Defense counsel was also concerned with the fact that the prosecutor had asked one juror if she had an opinion about

Albanians and the juror responded that they were vindictive troublemakers who were prone to violence. Defense counsel complained that the prosecutor had intimated that defendant's Albanian heritage compelled defendant to kill the victim as some sort of honor killing or because of disrespect.

The trial court determined that the prosecutor was trying to ascertain bias during voir dire when he interjected the fact that defendant was Albanian. But the trial court was persuaded that other comments were inappropriate.

> THE COURT: Yeah, I do not find the word 'compound' objectionable. I do not find the word 'patriarch' objectionable. All that means is that he is the head of the family, as you are the patriarch of your family, as your father is deceased. And I don't know the situation of the prosecutor. So I don't find those two terms objectionable. The only objectionable thing I heard at—during that opening statement was that "it all boils down to the Albanian nationality." It was right at the very beginning.

* * *

> THE COURT: And you couple that with the voir dire question to the juror who responded to your question are you going to be biased, and she says yes, because she perceives Albanians to be whatever she said. And not good, whatever she said wasn't good. So—
>
> MR. FOX [the prosecutor]: Right. But the voir dire question was—
>
> THE COURT: You, by making the statement that Viktor's Albanian put him and his nationality on trial.

Ultimately, the trial court ruled as follows:

> THE COURT: I feel, based on things that I heard, that we're putting the ethnicity of the Albanians on trial. They live in compound, which is a rude, crude word, although it's not—it can be interpreted that way, but you could have used they lived together as an extended family. When you start putting all the words together, you're creating an environment, which I agree with Mr. Barkovic [defense counsel], that's hostile, that's associated with the Albanian culture.
>
> MR. FOX: And, Judge, as you just indicated when you first started to address this, the word 'compound' was used twice in that half hour or so. Every other time, multiple times, I said a communal environment.

-16-

> THE COURT: But every time we hear 'compound' on the news, it's never good, ever is it good to hear 'compound' on the news and it's associated with good stuff. Never.
>
> MR. FOX: Judge, I apologize for how it is used on the news—
>
> THE COURT: I am going to grant the mistrial, but I'm not going to find that it was deliberately done. I don't believe that this prosecutor had any deliberate intention, which means we are going to re-pick a jury. And I am ready to do that this afternoon.
>
> The objective facts and circumstances in this case support the trial court's finding that the prosecutor's conduct was unintentional and not meant to goad defendant into moving for a mistrial. It is evident that it was not the prosecutor's intention to poison the jury against defendant, although he did use some unfortunate language. Additionally, the prosecutor strongly opposed defendant's motion for mistrial. We are not left with the definite and firm conviction that a mistake was made.

*People v. Shaholli*, 2016 WL 3429826, at *8–9.

Where a criminal defendant moves for a mistrial, the Double Jeopardy Clause does not bar a retrial. *See Oregon v. Kennedy*, 456 U.S. 667, 673–74 (1982). However, where the prosecutor's conduct that gave rise to the defendant's motion for a mistrial was intended by the prosecutor "to provoke the defendant into moving for a mistrial," the defendant "may invoke the bar of double jeopardy in a second effort to try him." *Id.* at 679. The standard for determining whether the prosecutor's actions were intended to goad or provoke a mistrial "is exacting." *Phillips v. Court of Common Pleas, Hamilton Cty., Ohio*, 668 F.3d 804, 811 (6th Cir. 2012) (quoting *Martinez v. Caldwell*, 644 F.3d 238, 243 (5th Cir. 2011)). "Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, . . . does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause." *Id.* (quoting *Kennedy*, 456 U.S. at 675–76). The relevant question is the prosecutor's intent. "Intent generally is inferred from objective facts and circumstances." *Id.* The fact that a prosecutor may have made bigoted comments, while misconduct, does not in and of

itself show an intent to goad a mistrial. *See United States v. Neufeld,* 1998 WL 320985, *2–4, (6th Cir. June 4, 1998) (prosecutor's references to the defendants' homosexual relationship, while inappropriate and grounds for a mistrial, did not demonstrate an intent to provoke a mistrial, so as to bar re-trial under the Double Jeopardy Clause).

In the present case, the Michigan Court of Appeals concluded that Petitioner was not goaded into requesting a mistrial. The trial judge herself, in granting the mistrial, found that the prosecutor's comments, while inappropriate, were not deliberate. A deferential standard of review applies to the Michigan Court of Appeals' rejection of Petitioner's double jeopardy claim. *See Aceval v. MacLaren*, 578 F. App'x 480, 482–83 (6th Cir. 2014), *as amended* (Sept. 15, 2014).

At worst, the prosecutor's conduct here was overzealous. There is no Supreme Court caselaw "that would bar retrial on double jeopardy grounds when the prosecutorial misconduct in the first trial aimed only to secure a conviction." *Aceval v. MacLaren*, 578 F. App'x at 483 (citing *Smith v. Coleman*, 521 F. App'x 444, 449 (6th Cir. 2013)).

At best, Petitioner has shown that the question of whether the prosecutor intended to goad a mistrial, such that Petitioner's retrial should have been barred by the Double Jeopardy Clause, presents a close question or a close call. This fact "militates against the conclusion" that the Michigan Court of Appeals' application of the relevant United States Supreme Court precedent or its determination of the facts was objectively unreasonable. *Davis v. Lafler*, 658 F.3d 525, 535 (6th Cir. 2011) (quoting *Lopez v. Wilson*, 426 F.3d 339, 358 n.1 (6th Cir. 2005) (en banc) (Cole, J., concurring) (internal quotation marks omitted). Petitioner has failed to meet the burden for habeas relief on Double Jeopardy grounds.

## C.

In his third claim, Petitioner alleges he was denied a fair trial because of prosecutorial misconduct. "Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). A prosecutor's improper comments will be held to violate a criminal defendant's constitutional rights only if they "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Prosecutorial misconduct will thus form the basis for habeas relief only if the conduct was so egregious as to render the entire trial fundamentally unfair based on the totality of the circumstances. *Donnelly v. DeChristoforo*, 416 U.S. at 643–45. To obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker v. Matthews*, 567 U.S. 37, 47 (2012) (quoting *Harrington*, 562 U.S. 86, 103 (2011)). A habeas petitioner must clear a "high bar" in order to prevail on such claims. *Stewart v. Trierweiler*, 867 F.3d 633, 638–39 (6th Cir. 2017).

Petitioner initially claims that the prosecutor improperly referred to Petitioner's mental competency in his opening statement, in violation of the judge's order that the parties could not refer to Petitioner's mental competency. Petitioner further claims that the prosecutor misstated the law by conflating the concept of mental competency with insanity. The Michigan Court of Appeals rejected the claim as follows:

> The prosecutor did not conflate the concepts of insanity and competence. In fact, the prosecutor indicated that these concepts, as well as the concept of mental illness, were different—"there's a difference, that he was mentally ill, that he was incompetent or that he was legally insane." In any event, the trial court thoroughly

and accurately instructed the jury on the issue of insanity and further admonished "[t]he lawyers' statements and arguments are not evidence. They are only meant to help you understand the evidence and each side's legal theories." Thus, to the extent that the prosecutor may have conflated the issues, such error was cured by the trial court's jury instructions.

*People v. Shaholli*, 2016 WL 3429826, at *10.

Assuming that the prosecutor's comments somehow mischaracterized the law regarding insanity, Petitioner would not be entitled to habeas relief in light of the fact that the judge gave the jurors the correct instruction on the defense of insanity as well as by instructing the jurors that the arguments and statements of the attorneys were not evidence. *See e.g. Clarke v. Warren*, 556 F. App'x 396, 405–06 (6th Cir. 2014).

The Michigan Court of Appeals further concluded that the prosecutor's mention of the competency issue did not violate the judge's order:

> Prior to selecting a jury at the second trial, a lengthy discussion took place regarding whether defense counsel could present to the jury the fact that defendant had been "locked up" for a year. The prosecutor objected to such a characterization. The trial court permitted defense counsel to discuss defendant's time at the Center for Forensic Psychiatry, with the caveat that the prosecutor would be able to "fill in the gaps" with reference to subsequent orders finding defendant competent. The trial court admonished the prosecutor that it could only tell the jury that defendant was found competent; the prosecutor was prohibited from further explaining that the trial court had previously determined that defendant was a malingerer. The prosecutor provided the jury with an appropriate explanation for defendant's hospitalization and did not violate the trial court's admonishment that evidence that its prior ruling finding defendant to be a malingerer would not be allowed.

*People v. Shaholli*, 2016 WL 3429826, at *10.

The prosecutor did not mention that Petitioner had been found to be a malingerer. Accordingly, the prosecutor did not violate the judge's order or commit misconduct.

Petitioner next contends that the prosecutor denigrated the defense and defense counsel with these remarks in his opening statement:

Now as a side note the Judge is going to talk to you about the credibility of witnesses, motivation to testify. No one expects Dr. Shiener to do this out of the goodness of his heart. But make no mistake there's compensation involved.

* * *

But Dr. Shiener doesn't rely on just the MRI and he doesn't rely on these headaches. His biggest reliance is this, Defendant, tell me about yourself. I don't know. What did you do? I don't understand these things, I don't know. Tell me about your family? I don't know. What happened? Where are you? I don't know. How am I supposed to know these things. Dr. Shiener takes Defendant at his word. Because he said I don't know so many times, my gosh, he must be mentally impaired.

* * *

It's a farce, it's a lie, it's a fake. It is what everyone from the Forensic Center says and calls malingering. Defendant is not legally insane. He's not even mentally ill.

* * *

But like I said when it all comes down to the end, when you're sitting in the back and say, oh, Dr. Shiener, well he's older, more experienced. My gosh, Defense might even say, and you might have heard this, he was a professor and he taught Dr. Neal. Yeah, Dr. Neal I think had a couple hours of class (inaudible). Dr. Neal is one of the most respected forensic psychiatrists around. There's a reason he's the head of a division in the Forensic Center. Dr. Neal can teach the old dog some new tricks. And the trick is, tell the truth and don't tell tricks at all. See Dr. Neal you can believe. I submit to you that he will be more credible. Dr. Rinnas I submit to you will be consistent and more credible. Dr. Shiener will tell the opposite. And you all might sit back there and (inaudible) at the time, oh my gosh, but Dr. One said this, Dr. Two said that; Dr. Two said that, Dr. Three said something else. What do you do? You know what you do, you remember November 20th, 2011. Because on November 20th, 2011, that's the Defendant who killed Dashamir. That's the man who grabbed a gun and executed his daughter in law's brother so the rest of the family would hate her. That's the man who was so aware of what he had done that he fled the scene, he dropped the gun, he drove home, he called for help to take him to the police station. Not to take him there, excuse me, he made it there all by himself. But when he got to there to have an interpreter so he could tell the police what he had done. Why? Because what he had done was wrong and he knew it.

There is no defense in this case. He is not legally insane.

*People v. Shaholli,* 2016 WL 3429826, at *11.

The Sixth Circuit has held that "[a] prosecutor commenting that the defense is attempting to trick the jury is a permissible means of arguing so long as those comments are not overly excessive or do not impair the search for the truth." *Brown v. McKee,* 231 F. App'x 469, 480 (6th Cir. 2007) (quoting *United States v. August*, 984 F.2d 705, 715 (6th Cir. 1992)). Thus, a prosecutor's isolated comments during opening or closing argument that the defense was attempting to trick the jury is not an improper disparagement of defense counsel. *Id.* The Sixth Circuit has rejected similar remarks as those made by the prosecutor in this case both on direct appeal from convictions in federal court and on habeas review of state convictions. *See Key v. Rapelje,* 634 F. App'x 141, 149 (6th Cir. 2015) (prosecutor's "smoke screen" or "octopus" argument was prosecutor's characterization of defendant's evidence that did not seriously affected jury's deliberations, and thus was not prejudicial prosecutorial misconduct required to reverse conviction); *United States v. Burroughs,* 465 F. App'x 530, 535 (6th Cir. 2012) (prosecutor's statement during closing argument, that defendant possessed both firearms and ammunition, and that "the rest of it" was "excuses and red herrings," did not denigrate defense counsel, so as to support finding of prosecutorial misconduct; statement merely "highlighted most damning evidence" against defendant, evidence that he in fact handled firearms, and argued that all of defense's explanations about why defendant handled them were irrelevant).

Moreover, even if the prosecutor's comments about Petitioner's defense or his expert were improper, they were not flagrant enough to justify habeas relief. *See Henley v. Cason,* 154 F. App'x 445, 447 (6th Cir. 2005); *see also Farmer v. Hofbauer,* 1 F. App'x 372, 378 (6th Cir. 2001) (prosecutor's comments in his closing argument during first degree murder trial questioning credibility of defendant's expert witnesses and urging jury not to adopt their conclusions regarding defendant's alleged insanity did not deny petitioner due process, where statements were vague,

brief, and disjointed, and trial judge cautioned jury that the lawyers' comments were not evidence). The prosecutor's comments were not so incendiary so as to inflame the jury's passion or distract them from determining Petitioner's guilt or innocence. *See Davis v. Burt*, 100 F. App'x 340, 348 (6th Cir. 2004). Finally, the prosecutor's "remarks were relatively isolated, were not extensive, and were only a small part of a closing argument that focused heavily on summarizing the evidence presented at trial." *Byrd v. Collins*, 209 F.3d 486, 532 (6th Cir. 2000). When combined with the instruction from the trial judge that the attorneys' arguments, questions, and statements were not evidence, the prosecutor's comments did not render the entire trial fundamentally unfair. *Id.* at 533.

Petitioner contends the prosecutor improperly vouched for the credibility of Dr. Neal. "The test for improper vouching for a witness is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility." *United States v. Causey*, 834 F.2d 1277, 1283 (6th Cir. 1987). "Generally, improper vouching involves either blunt comments, or comments that imply that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony." *See United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999) (internal citations omitted). It is worth noting that the Sixth Circuit has never granted habeas relief for improper vouching. *Byrd v. Collins*, 209 F.3d at 537 and n. 43. Indeed, "[T]he Supreme Court has never specifically held that a prosecutor's vouching for the credibility of a witness resulted in a denial of due process." *Wilson v. Bell*, 368 F. App'x 627, 632, n.3 (6th Cir. 2010). Even on direct appeal from a federal conviction, to constitute reversible error, a prosecutor's alleged misconduct of arguing his personal belief, in a witness' credibility or in a defendant's guilt, must be flagrant and not isolated. *See United States*

*v. Humphrey,* 287 F.3d 422, 433 (6th Cir. 2002) (overruled on other grounds in *U.S. Leachman,* 309 F.3d 377 (6th Cir. 2002)).

Petitioner is not entitled to habeas relief on this claim because the prosecutor's comment was brief and isolated. An isolated instance of vouching does not make a state trial so constitutionally infirm so as to justify federal habeas relief. *See e.g. Joseph v. Coyle,* 469 F.3d 441, 474 (6th Cir. 2006). Secondly, the prosecutor's remarks did not rise to the level of a due process violation necessary for federal habeas relief, because the sizeable amount of evidence offered by the state against Petitioner made it unlikely that the jury was misled by this brief statement. *See Wilson v. Mitchell,* 250 F.3d 388, 398 (6th Cir. 2001). Lastly, the jury was instructed that the lawyers' statements and arguments were not evidence. This instruction by the court cured any prejudice that may have arisen from any improper vouching. *Byrd,* 209 F.3d at 537.

Petitioner next argues that the prosecutor also injected issues broader than guilt when he mentioned the murder of a child in an unrelated murder case and that Petitioner possibly engaged in mortgage fraud. The Sixth Circuit has noted that there are no Supreme Court cases which support the proposition that a prosecutor's questions that call for answers that are "inadmissible due to relevancy constitute prosecutorial misconduct that rises to the level of a federal Due Process violation." *See Wade v. White,* 120 F. App'x 591, 594 (6th Cir. 2005). Petitioner would not be entitled to habeas relief even if the prosecutor's remarks about the unrelated murder of the child in Inkster, Michigan was irrelevant. *Id.*

Although F.R.E. 404(b) and its state counterpart M.R.E. 404(b) generally prohibit a prosecutor from questioning a defendant about prior bad acts, the United States Supreme Court has never held that the federal constitution forbids a prosecutor from doing so; thus, the Michigan Court of Appeals' rejection of Petitioner's prosecutorial misconduct claim involving the

prosecutor's mention of Petitioner's involvement in mortgage fraud would not entitle Petitioner to habeas relief. *See Wagner v. Klee*, 620 F. App'x 375, 378 (6th Cir. 2015).

Petitioner next contends that the prosecutor misstated the law by stating in his opening argument that the prosecutor was not required to prove motive. The Michigan Court of Appeals rejected this claim, concluding that the prosecutor's remarks were not improper because motive is not an element of the crime of murder that needs to be proven by the prosecutor. *People v. Shaholli*, 2016 WL 3429826, at *12. The prosecutor's argument was not improper because it did not misstate the law regarding motive; thus, Petitioner is not entitled to relief on this claim. *See Palmer v. Bagley*, 330 F. App'x 92, 107 (6th Cir. 2009).

Finally, the Michigan Court of Appeals rejected Petitioner's claim that the prosecutor committed misconduct during his closing argument by making remarks which were similar to the comments made during the prosecutor's opening statement. The Michigan Court of Appeals had earlier found the remarks made in the prosecutor's opening statement were not inappropriate. *Shaholli*, 2016 WL 3429826, at *13. The Michigan Court of Appeals' decision was reasonable, precluding habeas relief.

## D.

Petitioner claims he was denied the right to present a defense when the judge refused to allow him to admit evidence of two orders from the Macomb County Probate Court which appointed Petitioner a guardian and conservator. Petitioner claims that these orders could have been used to support his insanity defense and rebut allegations by the prosecutor that Petitioner was feigning his mental illness.

The Michigan Court of Appeals rejected the claim finding that the trial judge did not abuse her discretion in refusing to admit the orders because Michigan law does not permit evidence of a

defendant's lack of mental capacity that falls short of legal insanity to avoid or reduce criminal responsibility by negating specific intent. The insanity defense is the sole standard for determining criminal responsibility as it relates to mental illness or retardation. *People v. Shaholli*, 2016 WL 3429826, at *15. The Michigan Court of Appeals further concluded that Petitioner's right to present a defense was not violated:

> Defendant pursued the defense of legal insanity and presented expert testimony that he suffered from mental illness—severe depression and vascular dementia—such that he could not appreciate the consequences of his actions. The probate orders were not necessary for defendant to pursue an insanity defense.

*People v. Shaholli*, 2016 WL 3429826, at *16.

Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he also has the right to present his own witnesses to establish a defense. This right is a fundamental element of the due process of law. *Washington v. Texas*, 388 U.S. 14, 19 (1967); *see also Crane v. Kentucky,* 476 U.S. 683, 690 (1986) ("[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense'") (internal citations omitted). However, an accused in a criminal case "does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under the standard rules of evidence." *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). The Supreme Court, in fact, has indicated its "traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts." *Crane,* 476 U.S. at 689. The Supreme Court gives trial court judges "'wide latitude' to exclude evidence that is 'repetitive . . . , marginally relevant' or that poses an undue risk of 'harassment, prejudice, [or] confusion of the issues." *Id.* (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986)).

Under the standard of review for habeas cases as enunciated in § 2254(d)(1), it is not enough for a habeas petitioner to show that the state trial court's decision to exclude potentially helpful evidence to the defense was erroneous or incorrect. Instead, a habeas petitioner must show that the state trial court's decision to exclude the evidence was "an objectively unreasonable application of clearly established Supreme Court precedent." *See Rockwell v. Yukins,* 341 F.3d 507, 511–12 (6th Cir. 2003).

In 1994, the Michigan legislature enacted Mich. Comp. Laws § 768.21a, which set forth the legal standards for an insanity defense in Michigan. The Michigan Supreme Court has subsequently held that this statute abolished the diminished capacity defense in Michigan, and that "the insanity defense as established by the [Michigan] Legislature [in § 768.21a,] is the sole standard for determining criminal responsibility as it relates to mental illness or retardation." *See People v. Carpenter,* 627 N.W.2d 276, 283–85 (Mich. 2001); *see also Wallace v. Smith,* 58 F. App'x 89, 94 n.6. (6th Cir. 2003).

The Michigan Court of Appeals concluded that the trial judge did not err in refusing to allow evidence of the Macomb County Probate Court orders because Michigan law does not permit the introduction of any evidence of mental capacity that falls short of legal insanity. Petitioner does not show that the mental disability that caused the Probate Court to appoint a conservator and a guardian reached the level of insanity. "Due process does not require that a defendant be permitted to present any defense he chooses. Rather, states are allowed to define the elements of, and defenses to, state crimes." *See Lakin v. Stine,* 80 F. App'x 368, 373 (6th Cir. 2003). This Court must defer to the state courts' conclusion that Petitioner was not permitted under state law to introduce this evidence.

Moreover, Petitioner was not completely precluded from presenting evidence to support his insanity defense, as the Michigan Court of Appeals indicated. The trial court's refusal to allow defense counsel to introduce the Probate Court orders was not so egregious that it effectively denied Petitioner a fair trial, because Petitioner was not completely barred from presenting evidence in support of his insanity defense. *See Fleming v. Metrish*, 556 F.3d 520, 535–36 (6th Cir. 2009). With the quantum of evidence on the defense theory in the record, this Court concludes that Petitioner was afforded "a meaningful opportunity to present a complete defense." *Allen v. Howes,* 599 F. Supp. 2d 857, 873 (E.D. Mich. 2009) (citing *Crane*, 476 U.S. at 690). Petitioner is not entitled to relief on his sixth claim.

## IV.

Before Petitioner may appeal this Court's dispositive decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court rejects a habeas claim on the merits, the substantial showing threshold is met if Petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484–85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell,* 537 U.S. 322, 327 (2003). In applying that standard, a district court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.* at 336-37. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.

Petitioner has failed to make a substantial showing of the denial of a constitutional right. Accordingly, a certificate of appealability is not warranted in this case. The Court further concludes that petitioner should not be granted leave to proceed *in forma pauperis* on appeal, as any appeal would be frivolous. *See* Fed. R. App. P. 24(a).

## V.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus, ECF No. 1, is **DENIED**.

It is further **ORDERED** that a certificate of appealability is **DENIED.**

It is further **ORDERED** that permission to proceed *in forma pauperis* on appeal is **DENIED.**

Dated: May 27, 2020                    s/Thomas L. Ludington
                                       THOMAS L. LUDINGTON
                                       United States District Judge